# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### Case No. 17-23463-CIV-

**GRAND BAHAMAS HOLDING CORP.**, a Florida corporation, **3354 GRAND INC**, a Florida corporation, **CG 3415 GRAND, LLC**, a Florida Limited Liability Company, **FREEPORT DEVELOPMENT OF VILLAGE WEST CORPORATION**, a Florida Corporation, **GRAND ABBACO DEVELOPMENT II CORP.**, a Florida Corporation, **WEST GROVE DEVELOPMENT CORPORATION**, a Florida Corporation, **JULIO MARRERO**, and **ROSA MARRERO**;

     **Plaintiffs'**

v.

**William Driscoll**, a citizen of the State of Washington, **E.R. Middleton**, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, a citizen of the State of Washington, **F.J. Weyerhaeuser**, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, a citizen of the State of Washington, **A.E. Zaccaro**, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, a citizen of the State of Washington, **Colliers International South Florida, LLC**, a Delaware Corporation, the **City of Miami**, a municipal corporation, **Grove Village, LLC**, a Florida limited liability company, **GV Freeport, LLC**, a Florida limited liability company, **GV Paradise Island, LLC**, a Florida limited liability company, **GV Grand Bahama, LLC**, a Florida limited liability company, **GV Bimini, LLC**, a Florida limited liability company,

**Island Holiday, LLC**, a Florida limited liability company, **Peter Gardner**, a citizen of the State of Florida, **Orlando Benitez Jr.**, a citizen of the State of Florida, and **D D & C**, a citizen of the State of Florida;

     **Defendants'**

_____/

## COMPLAINT
## FOR DAMAGES AND OTHER RELIEF

Plaintiffs, Julio C. Marrero ("J. Marrero"), Rosa Marrero ("R. Marrero"), Grand Bahamas Holding Corp., a Florida corporation ("GB Holding") 3354 Grand Inc., a Florida corporation ("3354 Grand"), Bimini Development of Village West, Corp., a Florida Corporation ("Bimini"), CG 3415 Grand, LLC, a Florida limited liability company ("CG 3415), Freeport Development of Village West Corp., a Florida corporation ("Freeport"), Grand Bahamas Development of Village West Corporation, a Florida corporation ("Grand Bahamas"), Grand Abbaco Development II Corp., a Florida corporation ("Grand Abbaco II"), Jarrette Bay Investments Corporation, a Florida corporation ("Jarrette"), Paradise Island Development Corp., a Florida corporation ("Paradise"), West Grove Development Corporation, a Florida corporation ("West Grove"), (collectively the "Plaintiffs") (collectively GB Holding, 3354 Grand, Bimini, CG 3415, Freeport, Grand Bahamas, Grand Abbaco II, Jarrette, Paradise, and West Grove, hereinafter referred to as the "Affiliates"), by and through undersigned counsel, files this **Complaint to Recover Damages and for Other Relief** (the "Complaint"), against Defendants' **William Driscoll**, a citizen of the State of Washington, **E.R. Middleton**, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, a citizen of the State of Washington, **F.J. Weyerhaeuser**, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, a citizen of the State of Washington, **A.E. Zaccaro**, as Trustee

U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, a citizen of the State of Washington, **Colliers International South Florida, LLC**, a Delaware Corporation, the **City of Miami**, a municipal corporation, **Grove Village, LLC**, a Florida limited liability company, **GV Freeport, LLC**, a Florida limited liability company, **GV Paradise Island, LLC**, a Florida limited liability company, **GV Grand Bahama, LLC**, a Florida limited liability company, **GV Bimini, LLC**, a Florida limited liability company, **Island Holiday, LLC**, a Florida limited liability company, **Peter Gardner**, a citizen of the State of Florida, **Orlando Benitez, Jr.** ("Benitez Jr."), a citizen of the State of Florida, and **D D & C Financial Investments Corporation**, a Florida corporation ("DD&C"), a citizen of the State of Florida, and in support thereof, allege as follows:

## NATURE OF ACTION, JURISDICTION, AND VENUE

1.      The Plaintiffs bring this action against Defendants William Driscoll, a citizen of the State of Washington, E.R. Middleton, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, a citizen of the State of Washington, F.J. Weyerhaeuser, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, a citizen of the State of Washington, A.E. Zaccaro, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, a citizen of the State of Washington, Colliers International South Florida, LLC, a Delaware Corporation, the City of Miami, a municipal corporation, Grove Village, LLC, a Florida limited liability company, GV Freeport, LLC, a Florida limited liability company, GV Paradise Island, LLC, a Florida limited liability company, GV Grand Bahama, LLC, a Florida limited liability company, GV Bimini, LLC, a Florida limited liability company, Island Holiday, LLC, a Florida limited liability company, Peter Gardner, a citizen of the State of Florida, Benitez

Jr., a citizen of the State of Florida, and D D & C, a citizen of the State of Florida, seeking damages and other relief.

2.    This United States District Court for the Southern District of Florida has original jurisdiction pursuant to 28 U.S.C. § 1331 ("[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  The subject "Federal Question" jurisdiction arises from the following four counts: **Count I: Restraint of Trade in Violation of the Sherman Act,** *15 U.S.C. § 1*; **Count II: Violation of Equal Protection, and Due Process Rights In Violation of** *42 § U.S.C. 1983*; **Count III: Conspiracy for the Purpose of Depriving Equal Protection of the Laws, Rights, and Privileges In Violation of** *42 § U.S.C. 1985(3)*; **and Count IV: Violation of the National Bank Act Governing Usury,** *12 U.S.C. §§ 85-86* **And Declaratory Action that Island Holiday Has Forfeited All Interest Secured by the Island Mortgages**. Further, this Court has supplemental jurisdiction pursuant to *28 U.S.C § 1367*.

## PARTIES, JURISDICTION, VENUE

3.    Plaintiff GB Holding is a Florida corporation, with its principal place of business in Miami-Dade County, Florida. The personal property it has an interest in is regularly marketed for sale and investment, including financing, throughout the United States, and internationally.

4.    Plaintiff 3354 Grand is a Florida corporation, with its principal place of business in Miami-Dade County, Florida. The real property it owns is regularly marketed for sale and investment, including financing, throughout the United States, and internationally.

5.    Plaintiff Bimini is a Florida corporation, with its principal place of business in Miami-Dade County, Florida. The real property it owns is regularly marketed for sale and investment, including financing, throughout the United States, and internationally.

6.      Plaintiff Freeport is a Florida corporation, with its principal place of business in Miami-Dade County, Florida. The real property it owns is regularly marketed for sale and investment, including financing, throughout the United States, and internationally.

7.      Plaintiff Grand Bahamas is a Florida corporation, with its principal place of business in Miami-Dade County, Florida. The real property it owns is regularly marketed for sale and investment, including financing, throughout the United States, and internationally.

8.      Plaintiff Grand Abbaco II is a Florida corporation, with its principal place of business in Miami-Dade County, Florida. The real property it owns is regularly marketed for sale and investment, including financing, throughout the United States, and internationally.

9.      Plaintiff Jarrette is a Florida corporation, with its principal place of business in Miami-Dade County, Florida. The real property it owns is regularly marketed for sale and investment, including financing, throughout the United States, and internationally.

10.      Plaintiff Paradise is a Florida corporation, with its principal place of business in Miami-Dade County, Florida. The real property it owns is regularly marketed for sale and investment, including financing, throughout the United States, and internationally.

11.      Plaintiff West Grove is a Florida corporation, with its principal place of business in Miami-Dade County, Florida. The real property it owns is regularly marketed for sale and investment, including financing, throughout the United States, and internationally.

12.      Plaintiff CG 3415 is a Florida limited liability company, with its principal place of business in Miami-Dade County, Florida. The real property it owns is regularly marketed for sale and investment, including financing, throughout the United States, and internationally.

13.      Plaintiff J. Marrero is, and at all material times was, a resident of Miami-Dade County, and a citizen of the State of Florida. Mr. Marrero is a 67.5% shareholder investor in

Freeport, a 65% shareholder investor in Bimini, a 45% shareholder investor in GB Holding, 3354 Grand, Grand Bahamas, Grand Abbaco II, and West Grove, and a 40% shareholder investor in Jarrette. The shares Mr. Marrero owns in these entities has been marketed for sale and investment, including financing, throughout the United States, and internationally.

14.     Plaintiff R. Marrero is, and at all material times was, a resident of Miami-Dade County, and a citizen of the State of Florida. Mrs. Marrero is a 45% shareholder investor in Paradise, and a 45% membership certificate interest holder in CG 3415. The shares and membership certificate interest that Mrs. Marrero owns in these entities has been marketed for sale and investment, including financing, throughout the United States, and internationally.

15.     Defendant William Driscoll is a citizen of the State of Washington.

16.     Defendant E.R. Middleton, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, is a citizen of the State of Washington.

17.     Defendant F.J. Weyerhaeuser, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, is a citizen of the State of Washington.

18.     Defendant A.E. Zaccaro, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, is a citizen of the State of Washington.

19.     Defendant Colliers International South Florida, LLC is a Delaware limited liability company.

20.     Defendant City of Miami is a municipal corporation, incorporated under the laws of the State of Florida.

21.     Defendant Grove Village, LLC is a Florida limited liability company, with its principal place of business in Miami-Dade County, Florida.

22.     Defendant GV Freeport, LLC is a Florida limited liability company, with its principal place of business in Miami-Dade County, Florida.

23.     Defendant GV Paradise Island, LLC is a Florida limited liability company, with its principal place of business in Miami-Dade County, Florida.

24.     Defendant GV Grand Bahama, LLC is a Florida limited liability company, with its principal place of business in Miami-Dade County, Florida.

25.     Defendant GV Bimini, LLC is a Florida limited liability company, with its principal place of business in Miami-Dade County, Florida.

26.     Defendant Island Holiday, LLC is a Florida limited liability company, with its principal place of business in Miami-Dade County, Florida.

27.     Defendant Peter Gardner is a resident of Miami-Dade County, and a citizen of the State of Florida.

28.     Defendant Margaret Nee is a resident of Miami-Dade County, and a citizen of the State of Florida.

29.     Defendant Benitez Jr. is, and at all material times was, a resident of Miami-Dade County, and a citizen of the State of Florida. Mr. Benitez, Jr. is a 22.5% minority shareholder investor in Freeport, a 25% minority shareholder investor in Bimini, a 45% shareholder investor in GB Holding, 3354 Grand, Grand Bahamas, Grand Abbaco II, Paradise, and West Grove, and a 45% membership certificate interest holder in CG 3415.

30.     Defendant DD&C is a Florida corporation, with its principal place of business in Miami-Dade County, Florida. DD&C is an entity owned and controlled by Benitez, Jr.

31.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because the Plaintiffs causes of action accrued within this judicial district and a substantial part of the events and omissions giving rise to these claims occurred here.

32.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 ("[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  The subject "Federal Question" jurisdiction arises from: **Count I: Restraint of Trade in Violation of the Sherman Act, *15 U.S.C. § 1*; Count II: Violation of Equal Protection, and Due Process Rights In Violation of *42 § U.S.C. 1983*; Count III: Conspiracy for the Purpose of Depriving Equal Protection of the Laws, Rights, and Privileges In Violation of *42 § U.S.C. 1985(3)*; and Count IV: Violation of the National Bank Act Governing Usury, *12 U.S.C. §§ 85-86* And Declaratory Action that Island Holiday Has Forfeited All Interest Secured by the Island Mortgages**. Further, this Court has supplemental jurisdiction pursuant to *28 U.S.C § 1367*.

## PRELIMINARY BACKGROUND

33.     The Affiliates each own separate and individual real property parcels, comprising a 6-block semi-contiguous assemblage of real property, located in the nationally and internationally competitive real estate market pressure cooker that is Miami-Dade County, Florida, more specifically located on the frontage of Grand Avenue in Coconut Grove (the "Assemblage").

34.     The Assemblage is on the "frontage" portion of the street comprising Grand Avenue. This frontage is more desirable, lucrative, and valuable than any "back lots" located off of, and behind Grand Avenue, because the lots comprising the Assemblage are directly located on the main road Grand Avenue, and have more desirous zoning, development potential, and superior

value to lots not located on the frontage of Grand Avenue, *i.e.*, the back lots which are located at least one lot behind the frontage of Grand Avenue.

35.     Many of these less valuable "back lots" are owned and controlled by William Driscoll ("Driscoll"), Peter Gardner ("Gardner"), through various affiliated entities they own and control including Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama LLC, and GV Bimini, LLC, (collectively the "Pointe Group").

36.     The Pointe Group owns separate and individual real property parcels, interspersed behind the 6-blocks comprising the Assemblage, located as "back lots" at least one lot behind the frontage of Grand Avenue (the "Back Lots").

37.     Benitez, Jr. has purchased and had assigned to him, and to DD&C, several mortgages originated from institutional lenders which encumber some, but not all, of the Assemblage (the "Benitez Mortgages").

38.     Benitez, Jr. holds a mortgage which encumbers the entire Assemblage pursuant to the terms of that certain Settlement and Restructure Agreement dated March 19, 2010 (the "Global Mortgage").

39.     Only J. Marrero and R. Marrero of the Affiliates have pledged their shares and membership certificate interests (the "Security Agreement"), respectively, as part of the Settlement and Restructure Agreement dated March 19, 2010, and no other shareholders and membership certificate interest holders of the Affiliates have done so.

40.     Only J. Marrero has executed the second amended, consolidated and restated promissory note in the principal amount of $3,651,050.97 (the "Global Note"), as part of the Settlement and Restructure Agreement dated March 19, 2010, and no other shareholders and membership certificate interest holders of the Affiliates have done so.

## FACTUAL ALLEGATIONS

41.     In 2008, Jeffrey Gomez ("J. Gomez") a representative of the Pointe Group, and its affiliated entities and partners, approached J. Marrero with a draft contract to purchase the assemblage for approximately $30,000,000.00 (the "2008 Contract").

42.     J. Gomez explained that the Pointe Group, and its affiliated entities and partners were in the process of determining the owners of the Assemblage so they themselves could piece together and assemble the real estate for the purposes of developing, financing, and selling at a profit. However, when it was discovered that the Affiliates had already done so, especially over the more desirable and lucrative frontage of Grand Avenue represented by the Assemblage, a multi-million dollar contract for purchase and sale was drafted to be presented to the Affiliates.

43.     Before and during the pendency of the 2008 Contract, but prior to any closing thereof, the Pointe Group, and its affiliated entities and partners, began the process of acquiring the Back Lots located at least one lot behind the frontage of Grand Avenue, *i.e.*, behind and surrounding the Assemblage on the frontage of Grand Avenue.

44.     The acquisition of the Back Lots was to be a part of an assemblage of real property to be combined with the Affiliates Assemblage, once the Pointe Group, and its affiliated entities and partners closed on the 2008 Contract.

45.     The Affiliates Assemblage on the frontage of Grand Avenue was more desirable, lucrative, and valuable than any of the Back Lots located off of Grand Avenue that were being assembled by the Pointe Group, and its affiliated entities and partners, because the lots comprising the Assemblage are directly located on the main road Grand Avenue, and have more desirous zoning, development potential, and superior value to lots not located on the frontage of Grand Avenue, *i.e.*, the Back Lots located at least one lot behind the frontage of Grand Avenue.

46.     The Pointe Group, and its affiliated entities and partners, would eventually spend more than $22,000,000.00 for the purchase and acquisition of only Back Lots, not involving any real property owned by the Affiliates.

47.     During the pendency of the 2008 Contract, but prior to any closing thereof, the Pointe Group, and its affiliated entities and partners, began the process of re-zoning the Back Lots they owned, and also re-zoning the Assemblage which they did not own. It was during this time that the Pointe Group, and its affiliated entities and partners, merged the names of the LLC's that they originally purchased the Back Lots under, into different LLC's with names that by design would mirror the names of the Affiliates, as follows:

    a)     On July 17, 2008, CG 3576 Florida, LLC, CG 3548 Florida, LLC, and CG 3540 Florida, LLC, all owners of Back Lots, being merged into GV Freeport, LLC, which merger and renaming was effectuated and caused by the Pointe Group, and its affiliated entities and partners, to mirror the name of the Affiliate Freeport;     *and*

    b)     On July 24, 2008, CG 3380 Florida, LLC, and 3370 Florida Ave., LLC, all owners of Back Lots, being merged into GV Grand Bahama, LLC, which merger and renaming was effectuated and caused by the Pointe Group, and its affiliated entities and partners, to mirror the name of an affiliate Grand Bahamas Development of Village West Corporation ("Grand Bahamas").

        (collectively, CG 3576 Florida, LLC, CG 3548 Florida, LLC, CG 3540 Florida, LLC, CG 3380 Florida, LLC, and 3370 Florida Ave., LLC, shall be referred to as the "CG Entities");

        (collectively, GV Freeport and GV Grand Bahama, shall be referred to as the "GV Entities")

48.     The CG Entities, were merged into the GV Entities, so that a perception would be created that the GV Entities were somehow related to, affiliated with, or partners with the similarly named Affiliates, despite that not being true.

49.     Ultimately, the Pointe Group, and its affiliated entities and partners, defaulted on the 2008 Contract, and in doing so, forfeited approximately $4,000,000.00 in deposits and/or extension fees to the Affiliates, along with other property as consideration of defaulting.

50.     On or about June 8, 2009, the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village, consummated its purchase of two separate mortgages, and other related loan documents from Intercredit Bank, National Association (collectively the "Island Mortgages").

51.     The Island Mortgages encumber real property owned by affiliated entities of the Affiliates, and encumber real property also on the frontage of Grand Avenue, so that the status of the Island Mortgages could adversely affect the Assemblage and/or the Affiliates, including but not limited to clouding title that could adversely affect the ability to market and sell the entire contiguous Assemblage.

52.     On February 11, 2009, to help finance the acquisition of the Island Mortgages, and to finance soft costs of development including zoning, the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village, borrowed $4,600,000.00 from the Trust (the "Trust Loan"), by entering into a recorded Agreement Not to Encumber the Back Lots, and pledging the interests of the Island Mortgages to the Trust, among other securities all tied to the Grove.

53.     William Driscoll ("Driscoll"), E.R. Middleton, F.J. Weyerhaeuser, and A.E. Zaccaro, as Trustees U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated

6/13/58, and Dated 7/17/59 (collectively the "Trust"), are the holders and true owners of the Island Mortgages.

54.    Island Holiday, LLC ("Island") is the servicer of the Island Mortgages.

55.    Ellen Rose, Esq. represented Island Holiday, LLC in the assignment of the Island Mortgages from Intercredit Bank, National Association, to Island. Ms. Rose's law firm purports to have been in possession of the original loan documents since their assignment from Intercredit Bank.

56.    Despite defaulting on the 2008 Contract, the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village, continued the process of re-zoning the Back Lots they owned, but also continued re-zoning the Assemblage which they did not own.

57.    The Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village, utilized the services of zoning attorney L. Dougherty for re-zoning the Back Lots they owned, but also for the continued re-zoning of the Assemblage which they did not own.

58.    On May 19, 2010, L. Dougherty either knowingly, or with false representations provided by , given, or furnished by the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village, provided false information to the City of Miami Planning and Zoning Board, the Miami City Commission, and the City, in submitting an application for re-zoning the Back Lots they owned, but also for the continued re-zoning of the Assemblage which they did not own (the "Application"). The Affiliates did not learn of these false representations until at least 2014, and were not damaged by these false representations until 2015.

59.    The false information provided in the Application to the City, by L. Dougherty, on behalf of the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village, included, but is not limited to:

a)      The false representation that the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village, owned or had an interest significant enough in the Affiliates/Assemblage to re-zone the Assemblage, which was false;

b)      The false representation that the Affiliates were joining in the Application, and intended to be bound by the Application, which was false;

c)      The false representation that the Affiliates consented to the express terms of the Application, which was false; *and*

d)      The false representation that the Affiliates intended to have their Assemblage of front lots encumbered subject to the re-zoning that would culminate from the Application, which was false.

60.     The Affiliates did not learn of the preceding false representations until at least 2014, and were not damaged by these false representations until 2014.

61.     On January 24, 2013, the City passed a resolution through its Miami City Commission (the "City Commission"), approving with conditions a major use special permit (the "MUSP"), as a result of the Application (and the false information provided therein by L. Dougherty, on behalf of the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village) re-zoning not only the Back Lots, but also re-zoning the Assemblage. The City of Miami, the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village, all intentionally concealed from the Affiliates the true nature of the MUSP, at all times knowingly misleading and falsely representing to the Affiliates that the MUSP could be terminated at any time by the Affiliates.

62.     The MUSP cost the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village, millions of dollars to procure.

63.     Contrary to the representation by the City of Miami, the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village to the Affiliates that the MUSP could be terminated at any time, the MUSP committed the Affiliates, and encumbered the Assemblage by re-zoning, to all of the following responsibilities and requirements, amongst others, without notice to, or consent of the Affiliates:

          a)     Requiring the Affiliates to participate and undertake in the development and construction of the Assemblage that they own, and the Back Lots which they do not, pursuant to the Application, and the MUSP, at a cost of approximately $306,197,101;

          b)     Requiring the Affiliates to participate and undertake in the employment of 306 full time workers during construction, pursuant to the Application, and the MUSP;

          c)     Requiring the Affiliates to participate and undertake in the creation of approximately 219 permanent new jobs, to which the City would benefit by the generating of approximately $1,797,577.00 in annual tax revenue on a recurring basis.

64.     The MUSP, procured by the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village, artificially entangled the less desirable Back Lots, with the Assemblage owned by the Affiliates on the frontage of Grand Avenue, without the consent of the Affiliates, so that the MUSP operated as an adulteration and polluting of the title, marketability, and alienability of the Assemblage.

65.     Because of the intentional concealment of the true nature of the MUSP by the City of Miami, the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village, the Affiliates did not learn of the preceding false representations until at least 2014, and were not damaged by these false representations until 2014.

66.     Once the MUSP was approved and recorded in January 2013, the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village, were financially motivated to ensure the Affiliates could not sell the Assemblage to anyone other than to them. More specifically, if the Affiliates attempted to sell, or consummated a sale of the Assemblage to anyone other than the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village, the purpose of the MUSP would be destroyed by becoming unfeasible without the front lots representative of the Assemblage, the political promises made by the City would become impossible to deliver upon, the value of the Back Lots would precipitously drop by tens of millions of dollars, and the Trust Loan of $4,600,000.00 and any future advances thereon would go into default and fail to be secured in any manner.

67.     Beginning in 2014, the Pointe Group, its affiliated entities and partners, including the GV Entities and Grove Village, began to utilize both the MUSP (which seemed to show their control over both the Back Lots and the Assemblage), and their strategically planned similarity in entity names between the GV Entities and the Affiliates, to perpetuate a mythology to numerous potential buyers, realtors, corporate and commercial leasees, financial institutions, and other parties, including parties from several different states (as discussed further herein), falsely representing its ownership and control over the Assemblage, where there was no such ownership or control over.

68.     In March 2014, Benitez Jr. began feuding with his counsel Garbett, and other attorneys at GSAR, including Mr. Garbett's personal associate Mr. Antar Vaughan, Esq.,[1] on account of the fact that Benitez Jr. wanted to completely ignore his responsibility and duty under

---

[1] During Mr. Vaughan's tenure at GSAR, he eventually became a partner of the firm.

the law, and completely withhold providing any future payoff estoppels and accounting figures to the Affiliates, even upon a lawful request, to prevent future closings from happening, which was contrary to Mr. Garbett and Mr. Vaughn's advisement that it was a requirement both under Fla. Stat. § 701.04,[2] and pursuant to the fiduciary duty he owed as an officer and director of the Affiliates.

69.     In October 2014, after months of feuding with Garbett, Vaughn, and other attorneys at GSAR, Benitez, Jr. sought to terminate Garbett and GSAR, and sought out the retention of replacement counsel that would indulge him.

70.     Benitez Jr. sought replacement counsel that would facilitate his desire to completely withhold providing any future payoff estoppels and accounting figures to the Affiliates, even contrary to a lawful request, and to intentionally seek preventing future closings of the Assemblage from happening.

71.     Around this time, in December 2014, through February 2015, the Pointe Group had already spent more than $24-million to both purchase, and re-zone its Back Lots for commercial development *via* the MUSP. The MUSP was final by this time.

72.     As a condition of the MUSP imposed by the City of Miami for the Pointe Group's commercial development to be effectuated, and for the re-zoning to spring, the Pointe Group was required to acquire the Affiliates Assemblage.

73.     The Affiliates did not consent to, or participate in the process of the Pointe Group procuring its re-zoning MUSP.

---

[2] Pursuant to Fla. Stat. § 701.04, a mortgagee such as Benitez, Jr. has a statutory duty to provide valid payoff figures, including, "an itemization of the principal, interest, and any other charges properly due under or secured by the mortgage and interest on a per-day basis for the unpaid balance", within 14 days receipt of any such request from the mortgagor.

74.     Both the Pointe Group's Rear Assemblage, and its MUSP re-zoning the Rear Assemblage for commercial development, are worth millions of dollars less without the acquisition of the Affiliates Assemblage on the frontage of Grand Avenue.

75.     With knowledge that Benitez Jr. was the sole reason the original Pointe Group Closing did not happen, the Pointe Group and Benitez Jr. began discussions, which became negotiations, about what terms and conditions it would take for Benitez Jr. to agree to sell the Assemblage to the Pointe Group, so that they could pursue the development plan of the MUSP which required acquisition of the Assemblage.

76.     The Pointe Group continued their negotiations with Benitez Jr. because Benitez Jr. represented that they would impede any sale to the Pointe Group, unless they received the exact terms they wanted as side arrangements not disclosed to the Affiliates. However, the Pointe Group was aware, through prior dealings with the Affiliates, that there were numerous other shareholders, officers, and directors that were not being involved in these negotiations.

77.     Benitez Jr. did not disclose these discussions or negotiations with the Pointe Group to any of the Affiliates.

78.     Benitez Jr. negotiated and entered into a side agreement with the Pointe Group that would not be disclosed to the Affiliates. This agreement entailed Benitez Jr. and the Pointe Group, doing all things possible, including engaging in illegal conduct, to intentionally prolong and prevent the Affiliates from selling the Assemblage to any buyer other than the Pointe Group, and to prevent each of the Affiliates from attempting to sell their individual parcels on a "block by block" basis, rather than as an Assemblage.

79.     In entering into this agreement with Benitez Jr., the Pointe Group made the decision it was more likely they would be able to acquire the Assemblage by engaging in these illegal

pursuits, rather than alienating Benitez Jr. who had previously been the sole reason the Pointe Group Closing did not take place.

80.     As part of this side agreement, Benitez Jr. agreed to falsely claim that there was no real equity in the Assemblage, claiming that millions of dollars more than what was actually owed to Benitez Jr. would prevent any sale from happening other than in Benitez Jr.'s sole discretion. Benitez Jr. would use this non-existent authority to reject any interest from numerous potential buyers, realtors, corporate and commercial lessees, financial institutions, and other parties interested in investing in the Assemblage, other than those that would agree to affiliate themselves with the Pointe Group. Benitez Jr.'s conduct had the effect of significantly harming any interest in the Assemblage, and the marketability of the Assemblage, from third party buyers interested in purchasing.

81.     As part of this side agreement, Benitez Jr. agreed to falsely claim that Benitez Jr. was in control of the Affiliates, and that only Benitez Jr. had the authority to act on their behalf. Benitez Jr. would use this non-existent authority to reject any interest from numerous potential buyers, realtors, corporate and commercial lessees, financial institutions, and other parties interested in investing in the Assemblage, other than those that would agree to affiliate themselves with the Pointe Group. Benitez Jr.'s conduct had the effect of significantly harming any interest in the Assemblage, and the marketability of the Assemblage, from third party buyers interested in purchasing.

82.     As part of this side agreement, the Pointe Group, its principals Gardner and Driscoll, agreed to falsely claim that the MUSP they acquired gave them a right to the Assemblage which they did not have, and falsely claimed that the Assemblage could not be purchased without acquiring their Rear Assemblage as well. The Pointe Group's conduct had the effect of

significantly harming any interest in the Assemblage, and the marketability of the Assemblage, from third party buyers interested in purchasing.

83.     Beginning in March 2015, as part of this side agreement, the Pointe Group, its affiliated entities and partners, and its principals Gardner and Driscoll began to utilize the MUSP as a basis to perpetuate a mythology to numerous potential buyers, realtors, corporate and commercial lessees, financial institutions, and other parties interested in investing in the Assemblage, such as Publix, the Related Group, and other potential investors, including parties from several different states, falsely began representing control over the Assemblage, where no such control existed. The Pointe Group's conduct had the effect of significantly harming any interest in the Assemblage, and the marketability of the Assemblage, from third party buyers interested in purchasing.

84.     This "Equity Skimming" and "Clouding of Title" agreement, between Benitez Jr., the Pointe Group, Gardner, and Driscoll, would benefit Benitez Jr. by securing the maximum amount of unearned attorney's fees, default interest at an interest rate of 25%, and penalties that would continue to accrue on a daily basis, which would be shared as kickbacks amongst Benitez Jr. upon the seizure of the Assemblage by Benitez, Jr., and a subsequent conveyance of the Assemblage to the Pointe Group.

85.     This "Equity Skimming" and "Clouding of Title" agreement, between Benitez Jr., the Pointe Group, Gardner, and Driscoll, would also benefit the Pointe Group, Gardner, and Driscoll, by providing for their acquisition of the Assemblage, allowing their compliance with the requirements of the MUSP to do so, which would increase the value of their Rear Assemblage for commercial development by millions of dollars.

86.     On May 7, 2015, after a five-year moratorium of litigation between Island Holiday and the borrowers under the Island Mortgages, Island Holiday unilaterally terminated the moratorium. This moratorium was terminated because the Pointe Group, its affiliated entities and partners, including the GV Entities, Grove Village, and Island Holiday, became aware that the Affiliates were in the process of selecting a contract to sell the Assemblage to a third party. Such a sale to a third party would have destroyed the purpose of the MUSP by rendering it unfeasible without the front lots representative of the Assemblage, cancelled the ability to perform under the political promises made with the City that would then become impossible to deliver upon, the value of the Back Lots would precipitously drop by tens of millions of dollars, and the Trust Loan of $4,600,000.00 and any future advances thereon would go into default and fail to be secured in any manner.

87.     Pointe Group, its affiliated entities and partners, including the GV Entities, Grove Village, and Island Holiday, terminated the moratorium to use the Island Mortgages, and the encumbrance created without consent by the MUSP, as leverage to force the Affiliates to select their pre-selected buyer for the Assemblage, *i.e.*, Lincoln Company Property National, Inc., a Delaware corporation domiciled in Texas ("Lincoln").

88.     Pointe Group, its affiliated entities and partners, including the GV Entities, Grove Village, and Island Holiday, terminated the moratorium to use the Island Mortgages, and the encumbrance created without consent by the MUSP, as leverage to force the Affiliates to select their pre-determined buyer for the Assemblage, *i.e.*, Lincoln Company Property National, Inc., a Delaware corporation with its domicile in Texas ("Lincoln").

89.     Pointe Group, its affiliated entities and partners, including the GV Entities, Grove Village, and Island Holiday, desired to have Lincoln as the buyer of the Assemblage because

Lincoln would purchase the entire Assemblage, thereby preserving the MUSP, otherwise, if another purchaser would purchase portions of the Assemblage, or the entire Assemblage without any arrangement with them, the purpose of the MUSP would be destroyed by rendering it unfeasible, cancelling the ability to perform under the political promises made with the City that would then become impossible to deliver upon, the value of the Back Lots would precipitously drop by tens of millions of dollars, and the Trust Loan of $4,600,000.00 and any future advances thereon would go into default and fail to be secured in any manner.

90.     On July 10, 2015, both Island, J. Marrero, and affiliated corporations of the Affiliates, attended a mediation that went late into the evening, and which culminated in a confidential settlement agreement of the Island Mortgages amongst the parties, with certain commitments extended by the non-party Affiliates (the "Settlement Agreement").

91.     On Wednesday, July 1, 2015, a special meeting of the Affiliates was dully called and held (the "Shareholder Meeting"), to discuss certain confidential matters regarding the Assemblage and the Affiliates. The Shareholder Meeting was held in accordance with the bylaws and agreements governing the Corporate Affiliates, with a quorum present, and in accordance with the governing agreements of the Company Affiliate.

92.     These confidential matters included but were not limited to the current business strategy in marketing and selling the Assemblage, the identity of four unique purchasers (the "Proposed Purchasers"), procured and presented by realtor Lorenzo Perez, Jr. ("Perez Jr."), who had made contract offers to purchase the Assemblage.

93.     These confidential matters also included but were not limited to the Affiliates business strategy in negotiating with these four purchasers, including what combination of buyer criteria would be most desirable in selecting a purchaser, *e.g.*, the amount of purchase price,

amount of deposit, duration of inspection period, and duration for closing that would yield the highest likelihood for closing a transaction (the "Confidential Information").

94.     This Confidential Information represented a valuable and competitive trade secret of the real estate and other business interests of the Affiliates, that at all times was intended to be confidential and proprietary.

95.     The identity of the four Proposed Purchasers was intended and contractually obligated to remain confidential.

96.     A sale to any of the Proposed Purchasers would ultimately payoff and satisfy all of the lawful debts of the Affiliates, with equity left over for distribution to the shareholders and membership certificate holders, respectively, of the Affiliates.

97.     The Shareholder Meeting was also called to provide a forum to discuss, debate, and ultimately vote on selecting and entering into a contract to sell the Assemblage to one of the four Proposed Purchasers.

98.     The Shareholder Meeting was held at the offices of counsel to the Affiliates, Julio C. Marrero & Associates, P.A., located at 3850 Bird Road in Coral Gables, FL (the "Office").

99.     The Shareholder Meeting represented a pivotal point for Benitez Jr., and the Pointe Group.

100.    The Shareholder Meeting, and the Confidential Information to be presented and discussed, represented valuable information of what could be a substantial roadblock in any effort to intentionally prolong and prevent the Affiliates from selling the Assemblage to any buyer other than the Pointe Group, and to prevent each of the Affiliates from attempting to sell their individual parcels on a "block by block" basis, rather than as an Assemblage.

101.     The Shareholder Meeting would provide the, "who", "what", "where", "when", and "why" of the Affiliates strategy for selling the Assemblage, including valuable information for the identity of the Proposed Purchasers, and the terms of the offers the Proposed Purchasers were making.

102.     Prior to the Shareholder Meeting, Benitez Jr. had regularly skipped such similar meetings in the past. However, knowing that all of the shareholders and membership certificate interest holders in the Affiliates would be present, Benitez, Jr. attended the meeting to solely acquire intelligence, both off the record and on the record, and had no intention of participating in, or voting on any measure presented.

103.     As a result of the Shareholder Meeting, with Benitez Jr. attending but abstaining from voting, the following resolutions were unanimously passed and ratified by all other shareholders and membership certificate holders, respectively, of the Affiliates:

     **a.**     J. Marrero, and Muskat, were given authority to choose the best two out of four offers being made by third parties for the sale of the Assemblage;

     **b.**     J. Marrero, and Muskat, were given authority to negotiate the terms of the sale of the Assemblage with the two offers selected;

     **c.**     J. Marrero, and Muskat, were given authority to enter into a purchase and sale contract once the terms of the sale of the Assemblage were negotiated;

     **d.**     J. Marrero, and Muskat, were given authority to execute any and all closing documents for a closing of the purchase and sale contract;

     (collectively the "Resolution")

104.     Benitez, Jr attended the Shareholder Meeting to solely acquire intelligence, both off the record and on the record, and had no intention of participating in, or voting on any measure presented.

105.     Almost immediately after the Shareholder Meeting, Benitez Jr. began to use the information they garnered, to contact each of the Proposed Purchasers which were confidentially disclosed during the Shareholder Meeting, to prevent a closing that was not acceptable to Benitez Jr., and that was not compatible with the side agreement with Pointe Group, its affiliated entities, and partners.

106.     The Settlement Agreement with Island required the Affiliates to negotiate the sale of the Assemblage to Lincoln, within the context of certain pre-agreed terms, per the request of the Pointe Group, its affiliated entities and partners, including the GV Entities, Grove Village, and Island Holiday. However, despite being pre-selected by the Pointe Group, its affiliated entities and partners, including the GV Entities, Grove Village, and Island Holiday, Lincoln could not perform under these pre-agreed terms, including not being able to close within 120-days, but instead requesting more than double that in counter-offering a 270-plus closing date, so no contract was ever entered into between the Affiliates and Lincoln. The Affiliates complied and performed under the terms of the Settlement Agreement, so the Affiliates were free to re-commence seeking contracts and a closing with any other buyer for the Assemblage.

107.     On September 22, 2015, the Affiliates notified the Pointe Group, its affiliated entities and partners, including the GV Entities, Grove Village, and Island Holiday, that they were in the process of entering into a contract with a new buyer, and requested a payoff accounting of the Island Mortgages. The Affiliates expected this payoff accounting to conform to the terms of the Settlement Agreement. Instead, Pointe Group, its affiliated entities and partners, including the

GV Entities, Grove Village, and Island Holiday, determined they would not comply with the terms of the Settlement Agreement, and sought to destroy this transaction so the Affiliates could not sell.

108.    On October 13, 2015, the Affiliates presented Benitez Jr. with a $32,000,000.00 offer to purchase the Assemblage from the Affiliates, this time from the buyer Grand Ave Acquisitions, LLC ("Grand Ave LLC"). At the time of this offer, based upon this sales price, the Affiliates would have paid all of their lawful obligations, with equity leftover for the shareholders and membership certificate holders of the Affiliates.

109.    Grand Ave LLC was one of the Proposed Purchasers disclosed during the Shareholder Meeting.

110.    Benitez Jr. contacted the Proposed Purchaser Grand Ave Acquisitions, LLC ("Grand Ave LLC").

111.    Benitez Jr. falsely claimed to Grand Ave LLC that he was in control of the Affiliates, and that only Benitez Jr. had the authority to act on their behalf.

112.    Benitez Jr. falsely claimed to Grand Ave LLC that there was no real equity in the Assemblage, claiming that because millions of dollars more than what was actually owed, was owed to him, he would prevent any sale from happening.

113.    Benitez Jr.'s misrepresentations and false claims made a closing with Grand Ave LLC impossible.

114.    Beginning in April 2016, Benitez Jr. began to secretly negotiate for a sale of the Assemblage to the Terra Group, which is a locally prominent real estate developer (specifically in Coconut Grove).

115.    The Terra Group originally approached Benitez Jr. with their interest in the Assemblage, because the principal of the Terra Group, Mr. David Martin, was friends with Benitez

Jr., and Benitez Jr. had falsely claimed to Mr. Martin that Benitez Jr. was in control of the Affiliates, and that only Benitez Jr. had the authority to act on their behalf.

116.    Benitez Jr. did not disclose these discussions or negotiations with the Terra Group to any of the Affiliates.

117.    After months of secret negotiations undertaken between Benitez Jr., and the Terra Group, with consult of the Pointe Group, a "Benitez Jr.-Pointe Group" friendly contract offer emerged, with a deceiving $35,000,000.00 purchase price.

118.    Benitez Jr., through his counsel, presented this "Benitez Jr.-Pointe Group" friendly contract offer for $35-million to the Affiliates, with a message that this was the "best possible offer", specifically citing to the Confidential Information discussed during the Shareholder Meeting as a basis for this offer "exceeding any other offer" presented.

119.    After receipt of the offer by the Affiliates, J. Marrero reached out to the attorneys for the Terra Group, Mr. Ricardo Fraga, Esq., and Mr. Victor Diaz, Esq., to better understand and review the offer.

120.    After examination and review of the offer, in concert with the discussions with the attorneys for the Terra Group, the $35-million purchase price was obviously deceiving, because the contract offer required that the Pointe Group join in and benefit as a partner in the transaction, which partnership interest would deplete at least $3,000,000.00 of the purchase price which would have been otherwise been due to the Affiliates.

121.    This $3,000,000.00 depletion would then be shared amongst the Pointe Group, and Benitez Jr., all the while being siphoned away from the Affiliates.

122.    The $35-million purchase price was also deceiving, because the contract offer required that Benitez Jr. receive at least $5-million dollars more than what he was actually owed,

which excessive payoff would deplete at least $5,000,000.00 of the purchase price which would have been otherwise been due to the Affiliates.

123.    The Affiliates advised the Terra Group of these issues, *i.e.*, their objection to the Pointe Group receiving a $3-Million partnership interest, and their objection to Benitez Jr. receiving a $5-Million excessive payoff he was not entitled to, the Terra Group made several disclosures of Benitez Jr.'s conduct.

124.    During the secret negotiations, Benitez Jr. falsely claimed to the Terra Group that he was in control of the Affiliates, and that only Benitez Jr. had the authority to act on their behalf.

125.    During these secret negotiations, Benitez Jr. falsely claimed to the Terra Group that he was owed millions of dollars more than what was actually owed, hence the Benitez Jr. request to include language in the offer that would have paid him a $5-Million excessive payoff that he was not entitled to.

126.    After learning of these misrepresentations made by Benitez Jr., the Terra Group sought to negotiate with J. Marrero, Muskat, and the Affiliates directly.

127.    On June 23, 2016, after a lengthy negotiation process, the Affiliates as Sellers, and the Terra Group through a newly formed entity GV Grove Investments, LLC, a Delaware limited liability company as Buyers ("GV Investment"), were able to enter into a purchase and sale agreement (the "Terra Contract").

128.    During the pendency of the Terra Contract, the Pointe Group, its affiliated entities and partners, including the GV Entities, and Grove Village, negotiated directly with the Buyer for the inclusion of the Back Lots, and for a joint venture agreement that would preserve the MUSP.

129.    When it was apparent that the Buyer may elect not to include the Back Lots, and elect not to enter into a joint venture agreement that would preserve the MUSP, the Pointe Group,

its affiliated entities and partners, including the GV Entities, Grove Village, used the Island Mortgages, and the encumbrance created without consent by the MUSP, as leverage to falsely make representations to destroy the Terra Contract, including that more than double the amount actually owed pursuant to the terms of the Settlement Agreement were actually owed, when they were not (claiming approximately $7,000,000.00 was owed when only approximately $3,000,000.00 was owed pursuant to the terms of the Settlement Agreement).

130.    The City of Miami became aware that the Buyer GV Investment, an entity created by the locally prominent Terra Group, was under contract to purchase the Assemblage, and that the Buyer would possibly attempt to "revive" and build the plan as described in the MUSP, because of the Pointe Group, its affiliated entities and partners, including the GV Entities, and Grove Village's failure to do so.

131.    The City became aware that it would be beneficial for the Buyer, and would increase the chances of a closing, to put pressure on the Affiliates to sell the Assemblage by making any concessions the Buyer would request, which sale would allow the City to further its political motivations and goals as promised as part of the MUSP.

132.    Accordingly, the City selectively enforced its own ordinances and regulations, against the Affiliates, to aid the Buyer, in purchasing the Assemblage, in a disparate and inconsistent manner within which the same ordinances and regulations were not similarly enforced against other properties and owners of similarly situated and conditioned real property adjacent and neighboring the Assemblage.

133.    The effects of Benitez Jr.'s illegal conduct manifested itself and permeated the Terra Contract, to the detriment of the Affiliates.

134.     GV Investment required that the Terra Contract contain an entire section addressing Benitez Jr.'s misrepresentations, fraudulent conduct, and the perceived threat they would impede or prevent a closing.

135.     GV Investment required that the Terra Contract require the Affiliates to acquire Court Ordered payoff estoppel's of the balances owed to Benitez Jr., something that the Affiliates were otherwise entitled to pursuant to Benitez Jr.'s obligation to provide such a payoff pursuant to Fla. Stat. § 701.04, and pursuant to the fiduciary duty Benitez Jr. owed as an officer and director of the Affiliates (the "Benitez Payoff Provision").  Terra Contract, p. 6. ("The Sellers represent to the Purchaser that Orlando Benitez Jr. has previously impeded and/or opposed Sellers efforts in acquiring from him the loan balances to payoff and satisfy the mortgages that he, or an entity he has an interest in, has been assigned to be identified on the Commitment. Within 1-day following the Effective Date, the Sellers shall cause to be delivered to Benitez Jr. by Federal Express a payoff estoppel request pursuant to F.S. § 701.04, which requires the holder of a mortgage such as Benitez Jr. to deliver an estoppel letter setting forth the unpaid balance of the loan secured by the mortgage within 14-days of the written request. If Benitez Jr. does not provide a written response with an accurate loan balance acceptable to the Sellers and Purchaser in their sole and absolute discretion, then upon request of the Sellers, the Purchaser, its attorney's and necessary representatives will reasonably make themselves available to appear in any court of competent jurisdiction to support and seek a court order commanding that Benitez Jr. provide such accurate loan balances, including but not limited to seeking relief under F.S. § 55.141 (a court ordered judgment that can be paid to the clerk of court causing a satisfaction of any related mortgage and encumbrances")") (*Internal definitions omitted*).

136.    On July 6, 2016, and in order to perform under the Benitez Payoff Provision, the Affiliates requested a payoff estoppel pursuant to §701.04, Fla. Stat., and Benitez Jr. refused to comply and failed to provide any response.

137.    In order to comply with the Benitez Payoff Provision, and after Benitez Jr. failed to comply with §701.04, Fla. Stat., the Affiliates were forced to seek judicial intervention to determine the actual amounts owed by the Benitez Mortgages.

138.    Despite procuring such orders commanding that Benitez Jr. provide a payoff estoppel accounting for some of the Benitez Mortgages, Benitez Jr. continued to refuse to comply, and again failed to provide any response.

139.    Because of Benitez Jr.'s noncompliance in refusing to timely deliver accurate payoff estoppel figures to the Affiliates, GV Investment used this as a basis to request a radical reduction of the purchase price to the Terra Contract, and a radical extension of the closing date. Preliminarily, and subject to further evaluation of Benitez Jr.'s conduct, GV Investment requested an initial reduction of the purchase price down to $32-Million, and an initial extension of the closing date for an additional 9-months.

140.    As Benitez Jr.'s noncompliance in refusing to timely deliver accurate payoff estoppel figures to the Affiliates continued, and GV Investment's observation that Benitez Jr.'s conduct would eventually force all of the Affiliates into bankruptcy to effectuate any sale, GV Investment used this as a basis to request another radical reduction of the purchase price to the Terra Contract, down to approximately $30-Million.

141.    GV Investment eventually cancelled the Terra Contract when the Affiliates could not afford to make these concessions, caused by Benitez Jr.'s noncompliance in refusing to timely deliver accurate payoff estoppel figures to the Affiliates.

## COUNT I
## Restraint of Trade in Violation of the Sherman Act, 15 U.S.C. § 1

Plaintiffs re-allege paragraphs 1 through 141 as if fully set forth herein and further allege the following.

142.    Each of the Pointe Group parties, *i.e.*, William Driscoll, E.R. Middleton, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, F.J. Weyerhaeuser, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, A.E. Zaccaro, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama, LLC, GV Bimini, LLC, Island Holiday, LLC, and Peter Gardner, utilized their interest in the MUSP, the Island Mortgages, the Settlement Agreement, and their false and misleading statements regarding their interest in the Assemblage, as an artifice to restrain trade by limiting the ability to market the Assemblage, which directly caused a suppression in price of the Assemblage.

143.    Each of the Pointe Group parties, *i.e.*, William Driscoll, E.R. Middleton, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, F.J. Weyerhaeuser, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, A.E. Zaccaro, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama, LLC, GV Bimini, LLC, Island Holiday, LLC, and Peter Gardner, acted in this matter in concert with Benitez Jr., to further their agreement to prevent a closing.

144.    Colliers International South Florida, LLC ("Colliers"), was hired as the realtor to the Point Group parties.

145.    Colliers marketed the Assemblage under the knowingly false and misleading pretense that the Point Group was the beneficial owner of the Assemblage, as an artifice to restrain trade by limiting the ability to market the Assemblage, which directly caused a suppression in price of the Assemblage.

146.    Colliers is doing so to earn a large real estate commission upon a closing with the Pointe Group Parties, and so they have management rights upon any such closing.

147.    Colliers acted in this matter in concert with the Pointe Group parties, which furthered their agreement with Benitez Jr. to prevent a closing.

148.    Colliers acquired the Pointe Group from Peter Gardner.

149.    As part of the acquisition, Peter Gardner has unique control, oversight, and authority of the South Florida operations of Colliers.

150.    Benitez Jr. utilized his Global Mortgage, Global Note, and Security Agreement, as an artifice to restrain trade by refusing to provide payoff figures without any legal right to so so, and his false and misleading statements regarding their interest in and/or control over the Assemblage, as an artifice to restrain trade by limiting the ability to market the Assemblage, which directly caused a suppression in price of the Assemblage.

151.    Benitez Jr. acted in this matter in concert with the Pointe Group parties, which furthered their agreement to prevent a closing.

152.    These acts undertaken in concert with each other have had a substantial effect on the following instrumentalities of interstate commerce: **a)**   Substantially effecting out of state investment in the Assemblage, including imiting the financing of the Assemblage included by out-of-state investors, multi-state lending institutions, interstate mortgage market activity, and title insurance furnished by interstate corporations; **b)** Substantially effecting marketing, and earned

brokerage commissions for realtors domiciled and/or principally doing business in states other than Florida, that would be paid hundreds of thousands of dollars for any closing with a third party (the Assemblage is currently being listed by a California Corporation); **c)** Preventing construction from commencing on the Assemblage, including by out-of-state construction companies; *and* **d)** Limiting closings with out of state purchasers.

WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment: **(1)** declaring that William Driscoll, E.R. Middleton, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, F.J. Weyerhaeuser, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, A.E. Zaccaro, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama, LLC, GV Bimini, LLC, Island Holiday, LLC, and Peter Gardner, Colliers, and Benitez Jr., engaged in behavior constituting the restraint of trade in violation of section 1 of the Sherman Act, 15 U.S.C.A. § 1; **(2)** declaring them liable for damages in an amount to be determined by the Court for the actions that resulted in harm to the Plaintiffs; **(3)** awarding statutory and pre-judgment interest at the applicable rate; and **(4)** granting such other and further relief as this Court deems just and proper including if appropriate an award of attorneys' fees and costs.

**COUNT II**
**Violation of Equal Protection, and Due Process Rights**
<u>**In Violation of 42 § U.S.C. 1983**</u>

Plaintiffs re-allege paragraphs 1 through 152 as if fully set forth herein and further allege the following.

153.     It was the official policy of the City of Miami, and not the "rogue" whims of its employees, to selectively enforce its ordinances and regulations, including the issuance of selectively enforced liens, open permits, and code violations, directed against the Plaintiffs, to aid William Driscoll, E.R. Middleton, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, F.J. Weyerhaeuser, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, A.E. Zaccaro, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama, LLC, GV Bimini, LLC, Island Holiday, LLC, and Peter Gardner in their efforts to perform under the terms and conditions of the MUSP, which same ordinances and regulations were not similarly enforced against other properties and owners of similarly situated and conditioned real property adjacent and neighboring the subject property.

154.     Indeed, the City has grossly exaggerated and overstated the condition of the subject property, to further this selective enforcement.

155.     A custom existed, as required to state a claim for municipal liability in Plaitiffs § 1983 action, in which the City of Miami's issuance of the MUSP, and follow-up with open permits, liens, and code violations in a selective and arbitrary manner, constituted the unlawful taking of property akin to an eminent domain taking without adequate compensation, the deprivation of property rights, the denial of due process, and a violation of Plaintiffs right to equal protection under the law.

156.     In doing so, the City of Miami has played a game with and has unfairly treated the underprivileged minority citizens that otherwise would be able to occupy residential units located

on the Assemblage but for the selectively and arbitrarily issued open permits, liens, and code violations.

157.    Accordingly, the Plaintiffs have been damaged.

**WHEREFORE**, the Plaintiffs respectfully request that the Court enter judgment: **(1)** declaring that the City of Miami has acted in violation of 42 § U.S.C. 1983; **(2)** declaring them liable for damages in an amount to be determined by the Court for the actions that resulted in harm to the Plaintiffs; **(3)** awarding statutory and pre-judgment interest at the applicable rate; and **(4)** granting such other and further relief as this Court deems just and proper including if appropriate an award of attorneys' fees and costs.

**COUNT III**
**Conspiracy for the Purpose of Depriving Equal Protection of the Laws,**
**Rights, and Privileges In Violation of 42 § U.S.C. 1985(3)**

Plaintiffs re-allege paragraphs 1 through 152 as if fully set forth herein and further allege the following.

158.    Each of the Pointe Group parties, *i.e.*, William Driscoll, E.R. Middleton, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, F.J. Weyerhaeuser, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, A.E. Zaccaro, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama, LLC, GV Bimini, LLC, Island Holiday, LLC, and Peter Gardner, utilized their interest in the MUSP, the Island Mortgages, and their false and misleading statements regarding their interest in the Assemblage, as an artifice in concert with the City of Miami to aid its issuance of selectively enforced liens, open permits, and code violations, directed against the Plaintiffs, to facilitate the conditions of the

MUSP.

159.    Each of the Pointe Group parties, *i.e.*, William Driscoll, E.R. Middleton, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, F.J. Weyerhaeuser, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, A.E. Zaccaro, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama, LLC, GV Bimini, LLC, Island Holiday, LLC, and Peter Gardner, conspired with the City of Miami in its follow-up with open permits, liens, and code violations in a selective and arbitrary manner, constituting the unlawful taking of property akin to an eminent domain taking without adequate compensation, the deprivation of property rights, the denial of due process, and a violation of Plaintiffs right to equal protection under the law.

160.    Accordingly, the Plaintiffs have been damaged.

**WHEREFORE**, the Plaintiffs respectfully request that the Court enter judgment: **(1)** declaring that William Driscoll, E.R. Middleton, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, F.J. Weyerhaeuser, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, A.E. Zaccaro, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama, LLC, GV Bimini, LLC, Island Holiday, LLC, and Peter Gardner, has acted in violation of 42 § U.S.C. 1985; **(2)** declaring them liable for damages in an amount to be determined by the Court for the actions that resulted in harm to the Plaintiffs; **(3)** awarding statutory and pre-judgment interest at the applicable rate; and **(4)** granting

such other and further relief as this Court deems just and proper including if appropriate an award of attorneys' fees and costs.

**COUNT IV**
**Violation of the National Bank Act Governing Usury, 12 U.S.C. §§ 85-86**
**And Declaratory Action that Island Holiday Has Forfeited**
<u>**All Interest Secured by the Island Mortgages**</u>

Plaintiffs re-allege paragraphs 1 through 141 as if fully set forth herein and further allege the following.

161.    Island Holiday, LLC, was assigned the Island Mortgages from Intercredit Bank, which is a National Banking Association.

162.    The Island Mortgages are the subject of the non-usury requirements of the National Bank Act, *i.e.*, 12 U.S.C. § 85.

163.    The Island Mortgages are subject to the penalties provided for in the National Bank Act, *i.e.*, 12 U.S.C. § 86, requiring a forfeiture of all interest secured for a violation of Section 85.

164.    By intentionally breaching the terms of the Settlement Agreement which govern the Island Mortgages, and thereby knowingly seeking payment of double the amount actually owed, Island is seeking to charge a rate of interest greater than is allowed by section 85 of this title, *i.e.*, a usurious rate.

165.    Pursuant to 12 U.S.C.A. § 86, the entire amount of interest secured by the Island Mortgages is deemed forfeited for the intentional usurious collection activity of Island.

**WHEREFORE**, the Plaintiffs respectfully request that the Court enter judgment: **(1)** declaring that all interest secured by the Island Mortgages are forfeited; and **(2)** granting such other and further relief as this Court deems just and proper including if appropriate an award of attorneys' fees and costs.

**COUNT V**
**Quieting Title in the Plaintiffs,**
**and Removing the MUSP as a Cloud on Title**

Plaintiffs re-allege paragraphs 1 through 152 as if fully set forth herein and further allege the following.

166.    The City of Miami's issuance of the MUSP without the consent of the Plaintiffs constituted the unlawful taking of property akin to an eminent domain taking without adequate compensation, the deprivation of property rights, the denial of due process, and a violation of Plaintiffs right to equal protection under the law, in Violation of 42 § U.S.C. 1983, and 42 § U.S.C. 1985(3)

167.    The City of Miami, City of Miami, the Pointe Group, its affiliated entities and partners, including the GV Entities, Grove Village, Peter Gardner, and William Driscoll, all intentionally concealed from the Plaintiffs the true nature of the MUSP, at all times knowingly misleading and falsely representing to the Plaintiffs that the MUSP could be terminated at any time by the Plaintiffs.

168.    Contrary to the representations by the City of Miami, the Pointe Group, its affiliated entities and partners, including the GV Entities, Grove Village, Peter Gardner, and William Driscoll to the Plaintiffs that the MUSP could be terminated at any time, the MUSP committed the Plaintiffs, and encumbered the Assemblage by re-zoning, to all of the following responsibilities and requirements, amongst others, without notice to, or consent of the Plaintiffs:

      **a)**    Requiring the Affiliates to participate and undertake in the development and construction of the Assemblage that they own, and the Back Lots which they do not, pursuant to the Application, and the MUSP, at a cost of approximately $306,197,101;

   **b)**  Requiring the Affiliates to participate and undertake in the employment of 306 full time workers during construction, pursuant to the Application, and the MUSP;

   **c)**  Requiring the Affiliates to participate and undertake in the creation of approximately 219 permanent new jobs, to which the City would benefit by the generating of approximately $1,797,577.00 in annual tax revenue on a recurring basis.

  169. The MUSP, procured by the Pointe Group, its affiliated entities and partners, including the GV Entities, Grove Village, Peter Gardner, and William Driscoll, artificially entangled the less desirable Back Lots, with the Assemblage owned by the Affiliates on the frontage of Grand Avenue, without the consent of the Affiliates, so that the MUSP operated as an adulteration and polluting of the title, marketability, and alienability of the Assemblage.

  170. Because of the intentional concealment of the true nature of the MUSP by the City of Miami, the Pointe Group, its affiliated entities and partners, including the GV Entities, Grove Village, Peter Gardner, and William Driscoll, the Plaintiffs did not learn of the preceding false representations until at least 2014, and were not damaged by these false representations until 2014.

  171. The MUSP is *Void Ab Initio*.

  **WHEREFORE**, the Plaintiffs respectfully request that the Court enter judgment: **(1)** quieting title in the Plaintiffs and removing the MUSP as a cloud on title as being *Void Ab Initio*; and **(2)** granting such other and further relief as this Court deems just and proper including if appropriate an award of attorneys' fees and costs.

**COUNT VI**
**<u>Injurious Falsehood and Slander of Title</u>**

  Plaintiffs re-allege paragraphs 1 through 152 as if fully set forth herein and further allege the following.

172.    William Driscoll, E.R. Middleton, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, F.J. Weyerhaeuser, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, A.E. Zaccaro, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama, LLC, GV Bimini, LLC, Island Holiday, LLC, and Peter Gardner, have published false statements regarding the Plaintiffs, including but not limited to their ownership and control over the Assemblage.

173.    William Driscoll, E.R. Middleton, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, F.J. Weyerhaeuser, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, A.E. Zaccaro, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama, LLC, GV Bimini, LLC, Island Holiday, LLC, and Peter Gardner, have intentionally interfered with the Plaintiffs economic relations.

174.    William Driscoll, E.R. Middleton, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, F.J. Weyerhaeuser, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, A.E. Zaccaro, as Trustee U/A with Margaret W. Driscoll f/b/o W. John Driscoll, Dated 12/11/57, Dated 6/13/58, and Dated 7/17/59, Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama, LLC, GV Bimini, LLC, Island Holiday, LLC, and Peter Gardner, have intentionally made false statements slandering title to the Assemblage.

175.     Benitez Jr. has published false statements regarding the Plaintiffs, including but not limited to their ownership and control over the Assemblage.

176.     Benitez Jr. has intentionally interfered with the Plaintiffs economic relations.

177.     Benitez Jr. has intentionally made false statements slandering title to the Assemblage.

178.     As such, the Plaintiffs have been damaged.

**WHEREFORE**, the Plaintiffs respectfully request that the Court enter judgment: **(1)** that the parties named within this Count have intentionally interfered with the Plaintiffs economic relations; and **(2)** granting such other and further relief as this Court deems just and proper including if appropriate an award of attorneys' fees and costs.

### COUNT VII
### Breach of Contract – the Settlement Agreement
### (*Against Island Holiday, LLC*)

Plaintiffs re-allege paragraphs 1 through 152 as if fully set forth herein and further allege the following.

179.     Certain of the Plaintiffs, *i.e.*, 3354 Grand, Bimini, Freeport, Grand Bahamas, Grand Abbaco II, Jarrette, West Grove, CG 3415, J. Marrero, and R. Marrero, are intended third-party beneficiaries to the Settlement Agreement Contract with Island Holiday.

180.     The Settlement Agreement does not contain any language precluding enforcement by any third-party beneficiaries, such as 3354 Grand, Bimini, Freeport, Grand Bahamas, Grand Abbaco II, Jarrette, West Grove, CG 3415, J. Marrero, and R. Marrero.

181.     Island Holiday materially breached the terms of the Settlement Agreement, by, *inter alia*, failing to apply the appropriate loan credits and setoffs that were bargained for, and failing to deliver an accurate accounting pursuant to the terms of the Settlement Agreement, upon lawful

requests made on, including but not limited to, September 22, 2015, and July 2016.

182. Island Holiday breached the terms of the Settlement Agreement by sending a letter terminating the Settlement Agreement on October 9, 2015, without any legal justification for such a termination, where at the time, 3354 Grand, Bimini, Freeport, Grand Bahamas, Grand Abbaco II, Jarrette, West Grove, CG 3415, J. Marrero, and R. Marrero were performing and in full compliance with the Settlement Agreement.

183. Island utilized its interest in the Island Mortgages, the Settlement Agreement, and their false and misleading statements regarding their interest in the Assemblage, as an artifice to restrain trade in violation of 15 U.S.C. § 1 by limiting the ability to market the Assemblage, which directly caused a suppression in price of the Assemblage.

184. 3354 Grand, Bimini, Freeport, Grand Bahamas, Grand Abbaco II, Jarrette, West Grove, CG 3415, J. Marrero, and R. Marrero have performed all conditions precedent to the bringing of this suit, including performing all of their obligations in the Settlement Agreement.

185. Accordingly, 3354 Grand, Bimini, Freeport, Grand Bahamas, Grand Abbaco II, Jarrette, West Grove, CG 3415, J. Marrero, and R. Marrero have been damaged.

**WHEREFORE**, 3354 Grand, Bimini, Freeport, Grand Bahamas, Grand Abbaco II, Jarrette, West Grove, CG 3415, J. Marrero, and R. Marrero respectfully request that the Court enter judgment: **(1)** that Island Holiday has materially breached the terms of the Settlement Agreement; **(2)** that 3354 Grand, Bimini, Freeport, Grand Bahamas, Grand Abbaco II, Jarrette, West Grove, CG 3415, J. Marrero, and R. Marrero are intended third-party beneficiaries of the Settlement Agreement; and **(3)** granting such other and further relief as this Court deems just and proper including if appropriate an award of attorneys' fees and costs.

## COUNT VIII
## Breach of Contract and Anticipatory Repudiation
### (*Against Benitez Jr.*)

Plaintiffs re-allege paragraphs 1 through 152, and 172-178 as if fully set forth herein and further allege the following.

186.     On March 19, 2010, in order to secure the ability to adequately market, sell, or in the alternative refinance the Assemblage in the future, and to further secure Benitez Jr.'s fiduciary obligations, the Affiliates and J. Marrero entered into the Restructure Agreement, Partial Release Agreement, Global Note, and the Global Mortgage, with Benitez Jr.

187.     Benitez Jr. utilized his Global Mortgage, Global Note, and Security Agreement, as an artifice to restrain trade by refusing to provide payoff figures without any legal right to do so, and his false and misleading statements regarding their interest in and/or control over the Assemblage, as an artifice to restrain trade in violation of 15 U.S.C. § 1, by limiting the ability to market the Assemblage, which directly caused a suppression in price of the Assemblage.

188.     In the Restructure Agreement, Benitez Jr. agreed to at all times act in good faith as a director, officer, and shareholder, and as a lender, and agreed to a pre-negotiated framework to enter into a transaction to sell the Assemblage *via* the Good Faith Provision.

189.     In the Restructure Agreement, Benitez Jr. agreed to a specific sales price range per block that Benitez Jr. would accept for the sale of the Assemblage, and as the floor price for best financial interests *via* the Pre-Agreed Block Price Provision.

190.     In the Restructure Agreement, Benitez Jr. agreed to confidentiality of all matters related to the Restructure Agreement, including the business dealings, and business information of the Affiliates *via* the Confidentiality Provision.

191.     In the Restructure Agreement, Benitez Jr. agreed that the Global Mortgage could

be released on a per block basis without payment of the entire obligation, at any time, for a release price of $1,000,000.00 per block *via* the Partial Release Provision.

192.    By the Restructure Agreement, Benitez Jr. agreed that, "the Debtor [J. Marrero and R. Marrero] shall have 10 calendar days from the date of the notice [to wit on or before Tuesday, March 28, 2017] to advise Secured Creditor in writing that Debtor contests the Event of Default, describing the basis of Debtor's position" (*See* "Security Agreement", p. 4, ¶4.2)

193.    Voting rights of the shares of J. Marrero and R. Marrero remain intact until, "the court's adjudication that an Event of Default has occurred". *See* Security Agreement, p. 4, ¶4.2.

194.    This is the first filed case in any jurisdiction regarding adjudicating that any Event of Default under the Security Agreement has occurred.

195.    Benitez Jr. breached the terms of the Restructure Agreement, Partial Release Agreement, Global Note, the Global Mortgage, the Security Agreement, and all other agreements entered into therewith, by:

a)      Intentionally and falsely claiming that millions more dollars than were actually owed pursuant to the Benitez Mortgages;

b)      Intentionally and falsely claiming that Benitez Jr. is the beneficial owner or was otherwise in control of the Affiliates and the Assemblage.

c)      Intentionally and falsely claiming that the Affiliates lack the authority to market and sell the Assemblage, to numerous third parties including but not limited to Lincoln, Grand Ave LLC, the Terra Group.

e)      Intentionally and overtly disavowing any entitlement to payoff estoppel figures, and overtly disavowing any entitlement to the Partial Release Provision of the Restructure Agreement, despite multiple and numerous adequate reassurances being sought by the Plaintiffs.

   **f)**  Intentionally and overtly disavowing any entitlement to the Pre-Agreed Block Provision, despite multiple and numerous adequate reassurances being sought by the Plaintiffs.

   **g)**  Intentionally and overtly disavowing any entitlement to the Partial Release Provision, despite multiple and numerous adequate reassurances being sought by the Plaintiffs.

   **h)**  Intentionally providing inaccurate, incomplete, or deceiving loan balances, including but not limited to refusing to comply with valid requests for payoff estoppels made by the Affiliates on August 7, 2015, on July 6, 2016, and on other occasions, by withholding the amount owed, or intentionally providing inaccurate, incomplete, or deceiving loan balances, accounting for principal, interest, and attorney's fees, which information is uniquely in the possession of Benitez Jr., and his attorney's, that could be relied upon to consummate the purchase and sale of the Assemblage.

196. Because of the extent of Benitez Jr.'s breaches, Benitez Jr. has repudiated the Restructure Agreement, Partial Release Agreement, Global Note, Security Agreement, and the Global Mortgage, and conduct in furthering his Control Scheme and Confidential Information Scheme, several transactions for the purchase and sale of the Assemblage have been impeded, destroyed, and have not closed, including but not limited to the Contract with GV Investment.

197. Benitez Jr.'s repudiatory breach of the Restructure Agreement, Partial Release Agreement, Global Note, Security Agreement, and the Global Mortgage, and conduct in furthering his Control Scheme and Confidential Information Scheme, is the direct and proximate cause of damages incurred by the Plaintiffs.

198. The Plaintiffs have performed all conditions precedent to the bringing of this suit, including performing all of their obligations in the Restructure Agreement, Partial Release

Agreement, Global Note, Security Agreement, and the Global Mortgage.

199.    Accordingly, the Plaintiffs have been damaged.

### COUNT IX
### Breach of Fiduciary Duty

Plaintiffs re-allege paragraphs 1 through 152, 172-178, and 186-195, as if fully set forth herein and further allege the following.

200.    At all material times, Benitez Jr. has been an officer, and director of the Affiliates, with J. Marrero. As such, Benitez Jr. owed a fiduciary duty to discharge his duties in good faith, with the care of an ordinarily prudent officer or director, in a like position would exercise, and in a manner reasonably believed to be in the best interests of the Affiliates.

201.    The conduct of Benitez Jr. set forth herein constitutes a breach of the duty of loyalty and/or care owed to the Plaintiffs.

202.    The Plaintiffs reposed trust and confidence in Benitez Jr., for his status as an officer and director of the Affiliates.

203.    Benitez Jr. exhibited a conscious, grossly negligent, and/or reckless disregard for the best interests of the Affiliates, in relation to the facts and circumstances as set forth above. Benitez Jr. knew, or, except for conscious, grossly negligent and/or reckless disregard of the facts, should have known, of the risk of damage that ultimately befell the Affiliates.

204.    Benitez Jr. breached his fiduciary duties to the Affiliates.

205.    Benitez Jr.'s acts and omissions were adverse to the best interests of the Plaintiffs, and were neither intended to nor did confer any benefit on the Plaintiffs.

206.    Benitez Jr. was grossly negligent and/or acted with reckless disregard or in bad faith in the discharge of his duties.

207.    Only J. Marrero and R. Marrero of the Affiliates have pledged their shares and

membership certificate interests pursuant to the terms of the Security Agreement, respectively, as part of the Settlement and Restructure Agreement dated March 19, 2010, and no other shareholders and membership certificate interest holders of the Affiliates have done so.

208.    Only J. Marrero has executed the Global Note, as part of the Settlement and Restructure Agreement dated March 19, 2010, and no other shareholders and membership certificate interest holders of the Affiliates have done so.

209.    J. Marrero and R. Marrero incurred special damages unique to them, and not to any other shareholders or membership certificate interest holders.

210.    As a direct and proximate result of the conduct and breaches of fiduciary duty of Benitez Jr., the Plaintiffs were harmed and suffered damages.

**COUNT IX**
**Aiding and Abetting Breach of Fiduciary Duty**

Plaintiffs re-allege paragraphs 1 through 152, 172-178, 186-195, 196-210, as if fully set forth herein and further allege the following.

211.    At all material times, William Driscoll, Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama, LLC, GV Bimini, LLC, Island Holiday, LLC, and Peter Gardner, were aware that Benitez Jr. was and has been an officer, and director of the Affiliates, with J. Marrero. As such, Benitez Jr. owed a fiduciary duty to discharge his duties in good faith, with the care of an ordinarily prudent officer or director, in a like position would exercise, and in a manner reasonably believed to be in the best interests of the Affiliates.

212.    The conduct of Benitez Jr. set forth herein constitutes a breach of the duty of loyalty and/or care owed to the Plaintiffs.

213.    Benitez Jr. could not have breached his fiduciary duties to the Plaintiffs, including the Affiliates, J. Marrero, and R. Marrero, without the substantial aid, assistance, and support of

William Driscoll, Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama, LLC, GV Bimini, LLC, Island Holiday, LLC, and Peter Gardner.

214.    As a direct and proximate result of the conduct of William Driscoll, Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama, LLC, GV Bimini, LLC, Island Holiday, LLC, and Peter Gardner, the Plaintiffs were harmed and suffered damages.

215.    Only J. Marrero and R. Marrero of the Affiliates have pledged their shares and membership certificate interests pursuant to the terms of the Security Agreement, respectively, as part of the Settlement and Restructure Agreement dated March 19, 2010, and no other shareholders and membership certificate interest holders of the Affiliates have done so.

216.    Only J. Marrero has executed the Global Note, as part of the Settlement and Restructure Agreement dated March 19, 2010, and no other shareholders and membership certificate interest holders of the Affiliates have done so.

217.    J. Marrero and R. Marrero incurred special damages unique to them, and not to any other shareholders or membership certificate interest holders.

218.    As a direct and proximate result of the conduct of William Driscoll, Grove Village, LLC, GV Freeport, LLC, GV Paradise Island, LLC, GV Grand Bahama, LLC, GV Bimini, LLC, Island Holiday, LLC, and Peter Gardner, the Plaintiffs were harmed and suffered damages.

## PRAYER FOR RELIEF
### (As to All Counts)

Plaintiffs request the following relief:

a.    A jury trial and judgment against the Defendants;

b.    General, actual, and compensatory damages in an amount to be determined at trial;

c.      The cost of suit, including reasonable attorneys' fees, and costs;

d.      Pre-judgment and post-judgment interest at the maximum rate permitted by

applicable law; *and*

e.      Such other relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial as to all claims so triable.

**I HEREBY CERITFY** *that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am qualified to practice in this Court.*

**MARRERO, CHAMIZO, MARCER LAW, LP**

Counsel for the Plaintiffs
3850 Bird Road, Penthouse One
Coral Gables, FL 33146
julio@marrerolawfirm.com
Telephone: (305) 446-0163
Facsimile: (305) 444-5538

By: */s/ Julio C. Marrero, Esq.*
Julio C. Marrero, Esq.
Florida Bar No. 784664